336 F.2d 128
 TEXAS INDUSTRIES, INC., and Dallas Lightweight Aggregate
Company, Texcrete Structural Products Company,
Texcrete Mosaic Company, and Texcrete
Company, Divisions of Texas
Industries, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 20099.
 United States Court of Appeals Fifth Circuit.
 Sept. 2, 1964.
 
 John Edward Price, Fort Worth, Tex., for petitioners.
 Marcel Mallet-Prevost, Dominick L. Manoli, Melvin Pollack, Washington, D.C., for respondent.
 Before BROWN, WISDOM and BELL, Circuit Judges.
 GRIFFIN B. BELL, Circuit Judge.
 
 
 1
 Texas Industries, Inc. and its named divisions, Dallas Lightweight Aggregate Company, et al., have petitioned this court, pursuant to 10(f) of the National Labor Relations Act, as amended, 29 U.S.C.A. 160(f), to review and set aside an order of the National Labor Relations Board finding it in violation of 8(a)(1) of the Act. 29 U.S.C.A. 158(a)(1). The Board filed a cross petition requesting enforcement of its order. The Board found that the employer had violated 8(a)(1) through the medium of a letter sent to company employees just prior to a union election at its plant, and by interrogating employees about the contents of statements given to Labor Board agents, and requesting the employees to furnish the company with copies of those statements.
 
 I.
 
 2
 In October 1960, the union began an organizational drive at the company's Chalk Hill Road plant, and the Board held an election on June 30, 1961, at which the union was defeated. Three days prior to the election, the company mailed a letter to each of its two hundred employees urging them to vote against the union. This letter provided in pertinent part:
 
 
 3
 '2. The union is against your best interests. If the union wins the election, an outsider will negotiate or make demands upon the Company for you. There is no law that requires that I agree to anything he desires or says. (There is only one way that a union representative can enforce his demands upon the Company. This is by calling a strike. When you strike, you will lose your wages and possibly your job. The Company is free to hire someone to take your place while you are striking and when the strike is over there may not be a job for you.)
 
 
 4
 '3. The union question is not whether it is good for great numbers of men in the mass of employment industries, but whether it is best for you, your job and your family at this Company. Pretty generally in small companies the employees have refused to go along with union methods. They recognize that their jobs and earnings, including overtime depend upon the Company's ability to sell their product in the competitive market. (You know that under union methods we would not have been able to operate with continuous employment for you during the past year. Good pay checks depend upon continuous full time employment).'
 
 
 5
 The Board focused upon the bracketed portions of the above paragraphs from the letter,[1] and found that these statements were threats of economic loss should the union win the election, and as such constituted interference, restraint, and coercion of employees in violation of 8(a)(1) of the Labor Act.[2] We hold that these statements are protected by 8(c) of the Act, and order that this portion of the Board's order be set aside.
 
 
 6
 It is well settled that under 8(c)[3] the employer must be regarded as a rightful contestant for his employees' loyalty in a union election. This section permits an employer to state his legal rights under the Act and to predict that dire economic consequences will follow from a union victory. N.L.R.B. v. Transport Clearings, Inc., 5 Cir., 1963, 311 F.2d 519; Union Carbide Corp. v. N.L.R.B., 6 Cir., 1962, 310 F.2d 844. It is only when the employer goes further and threatens to himself take economic or other reprisals against the employees that a 8(a)(1) violation may be found. Thus, a prediction that competitive conditions will force a plant to close if a union contract is signed is protected, whereas a threat to close down in retaliation to unionization is beyond the pale. N.L.R.B. v. Morris Fishman & Sons, Inc., 3 Cir., 1960, 278 F.2d 792. The precise issue presented here is whether the above quoted letter constituted a prediction or a threat.
 
 
 7
 In paragraph 2 of the letter, the company has gone no further than to state its legal rights under the Act. It it true that no law requires the company to agree to union demands, 8(d), 29 U.S.C.A. 158(d); N.L.R.B. v. American National Ins. Co., 1952, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027, and that so long as the strike is not provoked by an employer unfair labor practice, the company is free to hire permanent replacements for the striking workers. N.L.R.B. v. Bradley Washfountain Co., 7 Cir., 1951,192 F.2d 144. The company does not threaten to force a strike in order to break the union. By merely stating its legal rights under the Act and indicating that it might follow a course which the Act clearly permits, the company may not be found to have threatened its employees in violation of 8(a)(1).
 
 
 8
 As to paragraph 3 of the letter, the Board objected only to the last two sentences, which it read as a threat to discontinue full time employment should the union win the election. We are unable to accept this reading. The statement is not phrased in the language of a threat. When read in context with the preceding part of the paragraph setting forth the need for the company to maintain its competitive position, the fair meaning of the statement is simply that unionization will lead to higher costs and consequently lower production and employment. This prediction of adverse economic consequences is protected by 8(c).[4]
 
 II.
 
 9
 The Board also found that the company violated 8(a)(1) by questioning employees about the contents of statements given to Board agents, and by demanding copies of these statements from the employees. The original complaint issued by the Board in this case charged the company with a discriminatory discharge in violation of 8(a)(3) and various acts of coercion in violation of 8(a)(1).[5] About two weeks prior to the hearing on this complaint, 147 of the company's two hundred employees were separately interviewed by the personnel manager and a company attorney. Each employee was asked a series of questions from a prepared questionnaire, including the following:
 
 
 10
 20. Have you talked to an agent of the NLRB about this case?
 
 
 11
 21. Did you give a sworn statement?
 
 
 12
 22. What, if anything, did you tell the agent of the NLRB?
 
 
 13
 23. Do you object to giving us a copy of the statement you gave the NLRB?
 
 
 14
 24. Will you sign a request for the NLRB to send a copy of your statement?
 
 
 15
 Four employees indicated that they had given statements to the Board, and all four agreed to sign letters prepared by the company requesting the Board to furnish them with copies of their statements. The Board complied with the requests, and copies were forwarded to the employees who in turn handed them over to the company. Each of the four was then again separately interviewed. A company attorney read each employee his statement, asked whether it was true, and questioned the employee about the incidents referred to therein.
 
 
 16
 At the hearing, the complaint was amended to include allegations that the above activities on the part of the company violated 8(a)(1), and the Board so held. In seeking to set aside this portion of the Board's order, the company contends first that the original charge filed by the union was inadequate to support the amended portion of the complaint, and second, that in any event its activities went no further than it was privileged to go in order to adequately prepare a defense to the pending unfair labor practice charges.
 
 
 17
 The original charge filed by the union in this case alleged generally that the company had 'engaged in * * * unfair labor practices within the meaning of' 8(a)(1) and (3), and then went on to allege specifically a discriminatory discharge and various acts of coercion with respect to employee Tadlock. The company maintains that the charge is addressed only to unfair labor practices committed against Tadlock, and that since Tadlock was not involved in the interrogation here found violative of 8(a)(1), there was an impermissible variance between charge and complaint. The Board contends that the general allegation of 8(a)(1) and (3) violations was sufficient to cover the interrogation of employees other than Tadlock. We agree with the Board.
 
 Section 10(b) of the Act provides:
 
 18
 'Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board * * * shall have power to issue * * * a complaint stating the charges in that respect * * *.'
 
 
 19
 It is established that this section precludes the Board from issuing a complaint on it own initiative, and that a charge is a prerequisite to the institution of proceedings before the Board. N.L.R.B. v. Kohler Co., 7 Cir., 1955, 220 F.2d 3. However, the charge is not a formal pleading, and its function is not to give notice to the respondent of the exact nature of the charges against him. N.L.R.B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Consumers Power Co. v. N.L.R.B., 6 Cir., 1940, 113 F.2d 38. This is the function of the complaint. The charge rather, serves merely to set in motion the investigatory machinery of the Board. It is largely for the benefit of the Board, not the respondent, so that it may intelligently determine whether and to what extent an investigation is warranted. Consequently, the Board has considerable leeway to found a complaint on events other than those specifically set forth in the charge, the only limitation being that the Board may not get 'so completely outside * * * the charge that it may be said to be initiating the proceeding on its own motion * * *.' N.L.R.B. v. Kohler Co., supra. See also N.L.R.B. v. Reliance Steel Products Co., 5 Cir., 1963, 322 F.2d 49; N.L.R.B. v. Raymond Pearson, Inc., 5 Cir., 1957, 243 F.2d 456.
 
 
 20
 In the light of these principles, we feel that the general allegation in the charge of violations of 8(a)(1) was sufficient. The company makes no claim that it was in any way prejudiced by the absence of a more specific charge. The interrogation of employees as to statements given to Board agents was closely related to the original charges referring only to Tadlock, in that this interrogation would never have occurred but for the original charge. Indeed, that was the occasion for the interrogation. Finally, it is consonant with efficient Board administration to allow collateral unfair labor practices stemming directly from the company's preparation of its defense to be disposed of in the same proceeding.
 
 
 21
 We come therefore to the merits of the interrogation question. The company vigorously maintains that by requesting from employees copies of statements given to Board agents, and by questioning the employees regarding the contents thereof, it went no further than was reasonably necessary in order to adequately prepare its defense to the pending unfair labor practice charges. In this connection it should be noted that the Board's rules do not permit general prehearing discovery of such statements. 29 C.F.R. 102.117 and .118. The rules do require production of the statement of any employee who is actually a witness at the hearing. 29 C.F.R. 102.118. The validity of these rules on their face has been upheld, and no challenge to them is presented here.[6]
 
 
 22
 In addition to the limited discovery permitted by the Board rules, the employer is privileged to question his employees about matters alleged in a complaint. N.L.R.B. v. Guild Industries Mfg. Corp., 5 Cir., 1963, 321 F.2d 108; N.L.R.B. v. Katz Drug Co., 8 Cir., 1953, 207 F.2d 168; Joy Silk Mills v. N.L.R.B., 1950, 87 U.S.App.D.C. 360, 185 F.2d 732. The privilege, however, is a narrow one. The test was stated by the court in Joy Silk Mills as follows:
 
 
 23
 'The Board has held that 'an employer is privileged to interview employees for the purpose of discovering facts within the limits of the issues raised by a complaint, where the employer, or its counsel, does so for the purpose of preparing its case for trial and does not go beyond the necessities of such preparation to pry into matters of union membership, to discuss the nature or extent of union activity, to dissuade employees from joining or remaining members of a union, or otherwise to interfere with the statutory right to self-organization.' In the Matter of May Department Stores Co., 70 N.L.R.B. 94.'
 
 
 24
 It is apparent that the Joy Silk Mills rule calls for a delicate balance between the legitimate interest of the employer in preparing its case for trial, and the interest of the employee in being free from unwarranted interrogation. N.L.R.B. v. Guild Industries Mfg. Corp., supra. Any interrogation by the employer relating to union matters presents an ever present danger of coercing employees in violation of their 7 rights. On the other hand, fairness to the employer dictates that he be given a reasonable opportunity to prepare his defense. Accommodation of these interests requires that the scope and manner of permissible questioning be strictly confined to the necessities of trial preparation. We hold that by interrogating its employees as to the contents of statements given to Board agents, and by seeking copies of these statements, the company exceeded these limits and thereby violated 8(a)(1).
 
 
 25
 It must be remembered that prior to the interrogation here complained of, the company had been served with a complaint framing the issues for trial. The company was not, therefore, in the dark as to which of its activities were alleged to be unfair labor practices. Thus, the company knew basically what it had to meet, and interrogation of its employees was justified only for the purpose of gathering evidence relevant to the pending charges. The question seeking to elicit all information given the NLRB agent, and the blanket request for copies of the statements employees had given the Board were indiscriminate inquiries which exceeded the necessities of the situation. Answers as well as the statements could well have revealed union membership and union activity, even though such membership and activity would have no bearing on any issue in the case. We are not satisfied that the company could not have adequately prepared for trial by merely questioning the employees about the specific matters alleged in the complaint particularly in view of the fact that under the Board's rules, the statement of any employee who actually testified would be available to it. This is not to foreclose inquiry as to whether a statement has been given with respect to matters contained in the complaint.
 
 
 26
 It would seem axiomatic that if an employee knows his statements to Board agents will be freely discoverable by his employer, he will be less candid in his disclosures. The employee will be understandably reluctant to reveal information prejudicial to his employer when the employer can easily find out that he has done so. No employee will want to risk forfeiting the goodwill of his superiors, thereby lessening his job security and promotion opportunities. It is no answer to say that the employee is free to refuse to furnish his employer with a copy of his statement. A refusal under such circumstances would be tantamount to an admission that the statement contained matter which the employee wished to conceal from the employer. In order to assure vindication of employee rights under the Act, it is essential that the Board be able to conduct effective investigations and secure supporting statements from employees. We feel that preserving the confidentiality of employee statements is conducive to this end.
 
 
 27
 It may be that under some circumstances a showing could be made that an employer would be justified in obtaining copies of employees' statements.[7] We are satisfied that such circumstances are not presented here.
 
 
 28
 Enforced in part, set aside in part, and remanded for further proceedings not inconsistent herewith.
 
 
 29
 JOHN R. BROWN, Circuit Judge (concurring specially).
 
 
 30
 I concur fully in the Court's action and its opinion in Part II, but as to Part I, I prefer to rest decision on the grounds discussed in note 4.
 
 
 
 [1]
 The brackets did not appear in the original letter, but have been inserted in the above quotation for convenience
 
 
 [2]
 Section 8(a)(1) provides:
 '(a) It shall be an unfair labor practice for an employer--
 '(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section (7) of this title * * *.'
 Section 7 provides:
 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *.'
 
 
 [3]
 'The expressing of any views, argument, or opinion, or the dissemination thereof * * * shall not constitute or be evidence of an unfair labor practice * * *.'
 
 
 [4]
 The Company also maintains that the legality of the letter was never properly placed in issue before the Board, since the complaint did not allege that the letter was unlawful, and since it was introduced in evidence by the company itself only for the purpose of refuting an allegation that the company had threatened to abolish the employee credit union. In view of our holding that the letter did not violate 8(a)(1), it is unnecessary to pass on this contention. However, we do note that the legality of the letter was not put in issue by the charge or complaint, or before the hearing examiner. It was gratutously extracted from the record by the Board upon its consideration of the case and made the basis of an unfair labor practice finding. Cf. N.L.R.B. v. Fulton Bag and Cotton Mills, 5 Cir., 1949, 175 F.2d 675 where the court condemned what appears to have been a less extreme procedure as violating fundamental conceptions of justice
 
 
 [5]
 The Board exonerated the company from these charges and not issue as to them is presented here
 
 
 [6]
 The Board rules formerly did not permit discovery of even witnesses' statements. In 1957, the Supreme Court decided Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, holding that a defendant in a criminal prosecution is entitled to 'an order directing the Government to produce for inspection all reports * * * touching the events and activities as to which (the witnesses) testified at trial.' The Second Circuit then held that the Jencks Rule was applicable to N.L.R.B. hearings. N.L.R.B. v. Adhesive Products Corp., 2 Cir., 1958, 258 F.2d 403. The Board amended its rules to conform with the Adhesive Products decision, and the rules as modified were upheld in N.L.R.B. v. Vapor Blast Mfg. Co., 7 Cir., 1961, 287 F.2d 402, and in N.L.R.B. v. Chambers Mfg. Corp., 5 Cir., 1960, 278 F.2d 715. But cf. Olson Rug Co. v. N.L.R.B., 7 Cir., 1961, 291 F.2d 655, where the court refused to restrict discovery in conformity with the Board's rules in a contempt proceeding, distinguishing Vapor Blast primarily on the grounds that in a contempt proceeding the court, not the Board, is charged with finding the relevant facts
 
 
 [7]
 In connection with discovery generally, the Administrative Conference of the United States has approved the principle in adjudicatory proceedings, and has recommended '* * * that each agency adopt rules providing for discovery to the extent and in the manner appropriate to its proceedings.' Recommendation No. 30, Selected Reports of the Administrative Conference of the United States, Senate Document No. 24, 88th Congress, 1st Session